1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   ------------------------------x
                                   :
 4   UNITED STATES OF AMERICA      :
                                   :
 5            versus               : Criminal Action No.
                                   :
 6   MILTON SMITH,                 : 1:15-CR-42
                                   :
 7                   Defendant. : February 3, 2017
     ------------------------------x
 8

 9           The above-entitled Sentencing Hearing was heard
     before the Honorable T.S. Ellis, III, United States District
10   Judge.

11                      A P P E A R A N C E S

12   FOR THE GOVERNMENT:        LAUREN BRITSCH, DOJ
                                US Department of Justice Criminal
13                              Division
                                Child Exploitation and Obscenity
14                              Section
                                1400 New York Ave NW
15                              Washington, DC 20530

16                              TRACY DOHERTY MCCORMICK, AUSA
                                US Attorney's Office
17                              2100 Jamieson Avenue
                                Alexandria, VA 22314
18
     FOR THE DEFENDANT:         JOHN KENNETH ZWERLING, ESQ.
19                              CARY JACOB CITRONBERG, ESQ.
                                Zwerling/Citronberg PLLC
20                              114 North Alfred Street
                                Alexandria, VA 22314
21

22   OFFICIAL COURT REPORTER:     MS. TONIA M. HARRIS, RPR
                                   United States District Court
23                                 Eastern District of Virginia
                                   401 Courthouse Square
24                                 Ninth Floor
                                   Alexandria, VA 22314
25                                 703-646-1438
```

2

TABLE OF CONTENTS
TRIAL
WITNESSES

On behalf of the Government:

Nina Blanchard

     Direct examination by the Court............... 05

Paul Arnett

     Direct examination by the Court.............. 15

Dr. Allison Leukefeld

     Court examination by the Court................ 25
     Cross-examination by Ms. McCormick............ 30
     Cross-examination by Mr. Zwerling............. 40

MISCELLANY

Preliminary matters................................. 03
Allocution......................................... 46
Court's sentencing................................... 60
Certificate of Court Reporter....................... 78

EASTERN DISTRICT OF VIRGINIA

3

1      **P R O C E E D I N G S**

2   (Court proceedings commenced at 1:29 p.m.)

3          THE DEPUTY CLERK:  U.S. versus Milton Smith, Jr.

4   Case No. 1:15-CR-42.

5          THE COURT:  All right.  Who is here for the

6   Government?

7          MS. MCCORMICK:  Good morning, Your Honor.  Tracey

8   McCormick for the United States and with me is Lauren Britsch

9   from the Child Exploitation Obscenity section and she's going

10  to be doing the argument today.

11         THE COURT:  Who will be heard today, both of you?

12         MS. MCCORMICK:  Lauren Britsch will be doing the

13  argument today.

14         THE COURT:  Good afternoon.  Mr. Zwerling, you're

15  here for the defendant.

16         MR. ZWERLING:  I am, Your Honor.  And Cary

17  Citronberg is here with me.

18         THE COURT:  All right, for the both of you.  Where

19  are Mr. and Mrs. Smith, are they back there?

20         MR. ZWERLING:  Right there, Your Honor.  And for the

21  record, the defendant is present in court in accordance with

22  --

23         THE COURT:  Yes.  Good afternoon to you, Mr. Smith.

24         THE DEFENDANT:  Good afternoon, Your Honor.

25         THE COURT:  I'm standing for the comfort of my back.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

4

1          This matter is before the Court for sentencing.

2    This defendant having been found guilty on the basis of a plea

3    of having engaged in a conspiracy to produce child

4    pornography.  In essence this defendant participated with

5    others on two websites.  It all started in South Africa.  And

6    what the members of the website did was to engage on the

7    Internet with underage young women, girls, and induce,

8    persuade these young girls to engage in lewd and lascivious

9    conduct on camera, on the Internet, which they then shared

10   with each other.  That is, the conspiracy members shared with

11   each other depending on their position in the conspiracy.

12          Now, what I'm going to do is a little unusual.  He

13   pled guilty some time ago.  It's almost been three years

14   before the sentencing.  And I think it is important for me to

15   make clear on this record the reason for this long period of

16   time and to do that before sentencing.  And to assist me in

17   doing that, I would like to have the probation officer, who

18   wrote the presentence report, come forward and take the oath.

19   And I'm going to use, through her testimony, will be the means

20   by which I explain the course this case has taken.

21          All right.  You may administer the oath to

22   Ms. Blanchard.

23          Thereupon,

24                          **NINA BLANCHARD,**

25   having been called as a witness on behalf of the Court and

5

1   having been first duly sworn by the Deputy Clerk, was examined

2   and testified as follows:

3            (Witness seated.)

4            THE COURT:  Now, I'll ask her the questions and then

5   you-all can ask any further questions you may wish to ask.

6            My goal is to tell you in effect, where the Court

7   stands, why all this time was taken, and what the situation is

8   as of today.

9                        **COURT EXAMINATION**

10  BY THE COURT:

11  Q.   Would you give us your name, please?

12  A.    Nina Blanchard.

13  Q.   And are you a probation officer in the Eastern District

14  of Virginia?

15  A.    Yes, sir.  I've been a probation officer in this district

16  since 1992.

17  Q.   And are you the probation officer who prepared the

18  presentence report for Milton Smith?

19  A.    Yes, sir.

20  Q.   Now, I originally heard his plea on what date?

21  A.    It was August 14 -- I'm looking for my chronology, if

22  you'll forgive me.

23  Q.   Don't lose that because I need that too.

24  A.    I've lost it temporarily.  If you could give me a moment.

25  The problem is there's a lot of documents in this case.

6

1          In the meantime I can tell you that he entered a

2     guilty plea.

3     Q.   It's in the presentence report?

4     A.   Yes.  That's what I'm looking for right now.

5          He entered a guilty plea on August 14th of 2015.

6     Q.   Now, at that time -- 2015?

7     A.   Yes.

8     Q.   At that time, I was aware that Mr. Smith had a lengthy

9     medical history and had more recently, although it was not

10    really diagnosed early on, I think the first problem was back

11    when he was six or before, but he was diagnosed more recently

12    with autism, is that right?

13    A.   That's correct.

14    Q.   And that caused me some concern because I wanted to be

15    clear that the Bureau of Prisons could accommodate someone

16    with autism.

17         Now, I have seen Mr. Smith in this courtroom on

18    several occasions.  He even testified in a case.  And I have

19    some experience with autism in my wife's family so I know

20    something about it.  And I have an impression and I think it

21    is shared by both the doctors who examined him and by Ms.

22    Blanchard, Ms. Blanchard you've -- let's continue the

23    chronology, first of all .

24         Did you, at my request, undertake to ascertain from

25    the Bureau of Prisons whether --

7

1          Thank you, Ms. White.

2              THE PROBATION:   Thank you, Your Honor.

3    BY THE COURT:

4    Q.   -- to ascertain from the Bureau of Prisons whether and

5    what steps they would take to deal with or accommodate an

6    inmate with Mr. Smith's problems?

7    A.   Yes, Your Honor.   Originally he was scheduled for

8    sentencing on December 11th.   On December 7th we spoke by

9    telephone and at that point I contacted the Bureau of Prisons

10   and asked them if they could provide me some information

11   regarding accommodations.

12   Q.   Did there follow then a period you struggled to find out

13   what the Bureau of Prisons would or could do with respect to

14   Mr. Smith?

15   A.   Yes, several months.

16   Q.   And at the time this was a serious problem because the

17   guidelines for Mr. Smith were what and are what?

18   A.   They are 360 months to life.

19   Q.   Now, what did you then do?

20   A.   So I took hundreds of documents that I obtained from his

21   mother and went through them and submitted them all to the

22   Bureau of Prisons, at their direction, to the Mid-Atlantic

23   regional office.   I sent those on December 15th of 2015 and

24   they forwarded those records to a group of psychiatrists in

25   Minnesota for review and response.   And I received a response

8

1    the following day.

2    Q.    In other words, did they really review the documents

3    before you got the response?

4    A.    I can't say, but it would -- it was very surprising to me

5    that they could have submitted a response that quickly with

6    that many documents.

7    Q.    You submitted hundreds of --

8    A.    Hundreds of pages.

9    Q.    And a day later you got the response?

10   A.    Right.

11   Q.    The answer is obvious, no they didn't review them.  You

12   got the standard answer that said what?

13   A.    It appeared to be somewhat of a form letter saying that

14   they can meet -- they can accommodate his needs and that they

15   would evaluate him when he came into their custody and they

16   would assign him accordingly.

17   Q.    And that's, I think, a typical and reasonable response

18   for the Bureau of Prisons to make.  But I was not satisfied so

19   I asked you to -- in fact I entered an order, did I not?

20   A.    Yes, you did.

21   Q.    And what was the date of that order?

22   A.    On December 7th of 2015, the Court instructed the defense

23   attorney to provide records to me.  I submitted them to the

24   Bureau of Prisons once I received them from his mother, they

25   responded very quickly, then -- let me see here, Your Honor

9

1   asked the Government to provide a memorandum to the Court by

2   January 13th of 2016 once we received the information from the

3   Bureau of Prisons.

4           So the letter was sent to the Government, the

5   Government filed it with the Court for the hearing that was

6   scheduled on January 22nd of 2016.  That was going to be the

7   sentencing hearing.

8   Q.  Well, in the interest of time I am going to lead a little

9   bit.

10          I think it's clear, I did not find that response by

11  the Bureau of Prisons to be adequate?

12  A.  That's correct.

13  Q.  Did I ask you to continue your efforts?

14  A.  You rescheduled sentencing for February 5th.

15  Q.  That's of 2016?

16  A.  Of 2016.  And then on February 5th of 2016 you gave the

17  parties 30 days to find somebody that they could both agree

18  upon to have a new evaluation done and submit to the Court.

19  Q.  And did that occur?

20  A.  Yes, Your Honor.

21  Q.  Who was selected?

22  A.  Dr. Jennifer Rohrer, R-o-h-r-e-r.

23  Q.  And she did submit a report, am I correct?

24  A.  She did.  She submitted a report to Your Honor in April.

25          THE COURT:  And I have that report in front of me

10

1   and it will -- any objection to it being made a part of the

2   sentencing record?

3           MS. BRITSCH:  Not from the government, Your Honor.

4           MR. ZWERLING:  I think so far we have had the --

5           THE COURT:  You want it under seal?

6           MR. ZWERLING:  Yes.

7           THE COURT:  I want the Bureau of Prisons to have as

8   much information.

9           MR. ZWERLING:  Then that's fine.  I'll withdraw the

10  request.

11          THE COURT:  Let me do it this way, Mr. Zwerling, and

12  see if this accommodates your concern.  It will be under seal

13  here but with the proviso that the Bureau of Prisons will have

14  access to it.  So in the Court record, it will be under seal,

15  but the Bureau of Prisons may have access.

16          Ms. Britsch, any objection?

17          MS. BRITSCH:  No, Your Honor.  And if it helps, the

18  Bureau of Prisons has already been provided that evaluation

19  pursuant to court order several months ago.

20          THE COURT:  All right.  I do want it then in this

21  record and it will be under seal.

22          MS. BRITSCH:  Thank you, Your Honor.

23  BY THE COURT:

24  Q.  And she reported in essence?

25  A.  On May 6th of 2016 she testified here in court as to her

1  findings and Your Honor continued sentencing at that point

2  with no specific date set --

3  Q.   Now, do you recall her testimony?

4  A.   I recall some of it, yes.  And I have -- I mean I have

5  her evaluation results.

6  Q.   Did she conclude that he had an autism condition?

7  A.   Yes, Your Honor.

8  Q.   And I want to -- I believe she used a term in describing

9  Mr. Smith?

10  A.   She described him -- I recall -- I recall she and I

11  having a phone conversation after she did her evaluation where

12  she said that he appeared very child-like.  And I had told her

13  that that was my impression as well.

14  Q.   Now, as you recall one of my chief concerns is whether

15  Mr. Smith, how he would fair in a general prison population.

16       Did Dr. Rohrer express a view about that?

17  A.   Yes, Your Honor.  If I recall correctly, she testified

18  that she felt that there was a very high risk of him being

19  taken advantage of.

20  Q.   Indeed I asked her that question?

21  A.   Yes, you did.

22  Q.   All right, so, now from Dr. Rohrer and others we learned

23  about a program.  Can you tell us about that?  A program that

24  might be suitable for Mr. Smith?

25  A.   The Bureau of Prisons has a program called the "Skills

1   Program" that is designed for inmates with brain development

2   disorders.

3   Q.   Not just autism?

4   A.   Not just autism.  Various brain development disorders.

5   They have two facilities in the country that have that

6   program.  One is in Massachusetts and one is in Florida.

7   Q.   And can you give a rough thumbnail sketch of these

8   programs?  They're called "skills" because they teach the

9   individual skills, is that right?

10  A.   That's correct.  The skills program -- it's called the

11  Skills Program.  I can't find my sheet on the skills program

12  that I was just reading about five minutes ago because of all

13  of these documents.  Sorry I keep flipping through things but

14  it is hard to keep track.  Here it is.

15          So the skills program, it says from the Bureau of

16  Prisons's website directly to quote:

17          "That it is a residential treatment program designed

18  to improve the institutional adjustment of inmates with

19  intellectual disabilities and social deficiencies.  It uses an

20  integrative model which includes modified therapeutic

21  community, cognitive, behavioral therapy and skills training.

22  The goal of the program is to increase academic achievement

23  and adaptive behavior of cognitively impaired inmates.  It

24  lasts 12 to 18 months.  It is voluntary.  And individuals who

25  complete it are able to stay there after a completion and work

13

```
 1   as mentors for newer people coming in."
 2   Q.   Now, importantly, are individuals in the skills program
 3   exposed to the general population?
 4   A.   No, they're not.  They're housed separately the entire
 5   time they are on that program.
 6   Q.   So it's a separate community?
 7   A.   Correct.
 8   Q.   Now, did you, at my request, make an effort to see if the
 9   Bureau of Prisons would place Mr. Smith in the skills program?
10   A.   Yes, Your Honor.
11   Q.   And what was the result of that effort?
12   A.   They essentially responded multiple times saying that on
13   the surface he appears eligible, but they would not commit to
14   anything until they had him in custody and could evaluate him
15   themselves.
16   Q.   And that's still their view today?
17   A.   Correct.
18   Q.   All right.  Now, I wanted to provide that thumbnail
19   sketch.  Let me go a little bit further.
20        How long -- who has been his supervisor while he's
21   been on release?
22   A.   He's been under monitoring with Paul Arnett from pretrial
23   services.
24   Q.   Mr. Arnett is present in the courtroom.  And in a minute
25   I'm going to have Mr. Arnett give us a little testimony
```

14

1   because I want him to describe the confinement that he's been

2   restricted for -- to home arrest and under the law he will not

3   get credit for that by the Bureau of Prisons.  But I want this

4   record to reflect how restrictive it is.  How restrictive that

5   confinement has been so that I may take it into account under

6   3553(a).

7              But let's finish now with Ms. Blanchard.  His current

8   guidelines remain 360 to life?

9   A.   His guidelines are 360 to life, but the statute caps him.

10  Q.   At?

11  A.   The statute is 15 to 30.  So he would be capped at 300

12  months.

13  Q.   360?

14  A.   360, yes.

15  Q.   360 months is the statutory cap?

16  A.   Yes.

17  Q.   And that's the base of the guidelines, correct?

18  A.   Correct.

19  Q.   All right.  Now, let me ask Ms. Britsch, do you have any

20  questions you want to ask the probation officer?

21            MS. BRITSCH:  No, Your Honor.  Thank you.

22            THE COURT:  Mr. Zwerling?

23            MR. ZWERLING:  No, Your Honor.

24            THE COURT:  All right.  Thank you --

25            THE WITNESS:  Thank you, sir.

15

1          THE COURT:  -- Ms. Blanchard.

2          (Witness excused.)

3          THE COURT:  Mr. Arnett, would you come forward, sir.

4   And when we're done with Mr. Arnett's testimony I just want to

5   be clear what the guidelines are and then I am going to tell

6   you what I intend to do and let you tell me why I'm wrong.

7          Come forward, sir and take oath, please.

8          Thereupon,

9                           **PAUL ARNETT**,

10  having been called as a witness on behalf of the Court and

11  having been first duly sworn by the Deputy Clerk, was examined

12  and testified as follows:

13          (Witness Seated.)

14          THE COURT:  Good afternoon, Mr. Arnett.

15          THE WITNESS:  Good afternoon.

16  BY THE COURT:

17  Q.   And would you give us your full name for the record.

18  A.   Paul Arnett.

19  Q.   And are you a U.S. probation officer here in the Eastern

20  District of Virginia?

21  A.   I am.

22  Q.   And how long have you served in that capacity?

23  A.   Since the year 2000.

24  Q.   And what role, if any, did you play with respect to Mr.

25  Smith?

16

1  A.   I'm in charge of the home electronic monitoring program,

2  so I've monitored him since he was released in December of

3  2014 on home detention.

4  Q.   So he was on home detention from when to when?

5  A.   He actually started on December 19, 2014.  So as of

6  today, that's 778 days.

7  Q.   All right.  And can you describe the home detention

8  situation for him in terms of how restrictive it was?

9  A.   Out of 776 days if I conservatively said he left his

10 house 100 of those days to go to doctor's appointments and

11 therapy sessions, other than that he's pretty much confined to

12 his townhome that he shares with his parents and siblings.

13 Other than that he doesn't even go outside.  So, I think he

14 may have helped his father with some yard work on very brief

15 rare occasions, but even that is pretty rare for me to get any

16 sort of request from him.  I would go to his house monthly to

17 check on him and he was always there.  And I -- and I assumed

18 looking for some interaction.  I never saw him with friends

19 that would come over.  So I feel like his therapist and his

20 probation officer were his social outlets.

21 Q.   Did you, over that period of time, see him on numerous

22 occasions?

23 A.   I saw him at least monthly if not more than that since

24 2014.  And in just talking about the restrictiveness of it,

25 you know anything he would ask to go for, to leave the house,

17

1   we would have to verify it and confirm it and we would watch

2   to make sure he left at a certain time and was at home at a

3   certain time.  Quite frankly, he's been under more restriction

4   than if he were to be in prison.  I mean he would have much

5   more freedom to go and exercise and have a job which he hasn't

6   had in the facility.  So, I think he's going to find that

7   he -- this is horrible to say that prison is going to be more

8   freedom for him than where he has been in the last 778 days.

9   Q.   In the course of the many occasions that you have had

10  contact with Mr. Smith, have you formed an opinion or an

11  impression of him that might be useful here?

12  A.   Well, I don't know if it could be useful, but I

13  definitely have an impression of him.  He certainly is -- is a

14  friendly individual, but socially awkward and just has some

15  difficulty in general communication and social conversation.

16          THE COURT:  Dr. Rohrer testified that he was

17  childlike and I think Ms. Blanchard had the same view.

18          Is that correct, Ms. Blanchard?

19          MS. BLANCHARD:  Yes, Your Honor.

20          THE COURT:  Do you agree with that?

21          THE WITNESS:  That's probably accurate.  He

22  certainly doesn't present as a 35-year-old in my opinion.

23          THE COURT:  Ms. Britsch, do you have any other

24  questions?

25          MS. BRITSCH:  No, Your Honor.

18

1    THE COURT:  Mr. Zwerling?

2    MR. ZWERLING:  No, Your Honor.

3    THE COURT:  Thank you.  You may step down, sir.

4    (Witness excused.)

5    THE COURT:  All right.  Obviously, I have delayed

6  this sentencing to be sure that I could be secure in the

7  knowledge of how the Bureau of Prisons would handle this young

8  man in the circumstances.  I think I now have sufficient

9  assurance about how I'm going to do it, what I'm going to do.

10  I've heard -- read your briefs, and I have a pretty well

11  developed view that I'm going to give you and give you an

12  opportunity to tell me why it's wrong.

13    And I am acutely aware of the fact that I have

14  sentenced other defendants to sentences of 20 and 21 years.

15  Is that right, Ms. Britsch?

16    MS. BRITSCH:  Your Honor, it's been a range of 18 to

17  21 years.

18    THE COURT:  Thank you.

19    Now, I intend to depart downward from the guidelines

20  on two bases.  One is Section 5K1.1 because the Government

21  seeks a downward departure on that basis.  Mr. Smith testified

22  at the case of one of the co-defendants and his testimony was

23  clearly honest, straightforward.  In fact, it was refreshingly

24  direct.  His answers were consistently monosyllabic and

25  straightforward.  And in the times I've seen Mr. Smith in the

1    courtroom, I think Dr. Rohrer and Ms. Blanchard, I think that

2    impression is one that I share.  But he deserves a downward

3    departure for the cooperation.  I'm also going to depart

4    downward under Section 5K2.13, which states that a downward

5    departure may be warranted if the defendant committed an

6    offense while suffering from a significantly reduced mental

7    capacity.

8           Mr. Smith is a smart young man in many ways.  I

9    think his mother would tell me that.  Am I right, Mrs. Smith?

10          MRS. SMITH:  Right.

11          THE COURT:  But he is also very childlike in some

12   ways.  Would you agree with that, Ms. Smith?

13          MRS. SMITH:  Yes.

14          THE COURT:  So, I think his situation and his mental

15   condition did play a role in his being encouraged or induced

16   to engage in this activity.  Does the Government disagree?

17          MS. BRITSCH:  Yes, Your Honor, the Government does.

18          THE COURT:  All right.  Go ahead.

19          MS. BRITSCH:  Well, first of all, Your Honor, the

20   guidelines Section 5K2.13 specifically says, that a downward

21   departure under this section may not apply to a defendant

22   who's been convicted of a child pornography offense, that is

23   an offense under Chapter 110.

24          THE COURT:  Of course you're right.  I overlooked

25   that.  You're quite right.

20

1    I think that's wrong because I don't think they know

2  the range of mental situations that could occur in that

3  regard, but you're right to point that out.  I could also

4  depart downward under 5K2.0.

5        What is 5K2.0, Ms. Britsch?

6        MS. BRITSCH:  It first starts with upward departures

7  and downward departures in criminal cases other than child

8  crimes and sexual offenses.  Sorry, I'm trying to read on from

9  that.  Downward departures and child crimes and sexual

10  offenses Section B -- and I apologize, Your Honor, I'm not

11  familiar with this particular guideline section.

12        THE COURT:  Well, that's quite all right.  I raise

13  it sua sponte because it seems to me that as a factual matter,

14  he is induced to do this in part because of his condition,

15  autism.

16        And the fact that the guidelines don't specifically

17  address it, is not surprising.  In fact, when Ms. Blanchard

18  inquired, I inquired of the Bureau of Prisons:  How many

19  people do you have there with autism?  Oh, we have plenty.

20        And in fact Ms. Blanchard determined that it was

21  fewer than a handful, is that right?

22        MS. BLANCHARD:  Yes, Your Honor, at this time there

23  were two.

24        THE COURT:  So it's not something the law is that

25  familiar with.  But, I'm not going to depart downward if

21

1  there's a valid reason not to on those facts.  And I'm

2  perfectly happy to have you instruct me whether you think

3  5K2.0 would work.

4       I think you're correct about diminished mental

5  capacity.  Although, I think it's just that the guidelines

6  people know about as much about autism as I did ten years ago

7  or 20 years ago, which is nothing.

8       MS. BRITSCH:  Yes, Your Honor.  And the Government

9  appreciates that.  However, there's also no evidence before

10  the Court, no psychologist or doctor has opined that Mr. Smith

11  is of such diminished capacity that he does not understand

12  right from wrong.  He was not on any medication the time the

13  offense occurred --

14       THE COURT:  I think you missed the point.  I accept

15  your view on 5K2.13.  What was it, 13?

16       MS. BRITSCH:  Yes, Your Honor.

17       THE COURT:  But I'm now looking at 5K2.0.

18       MS. BRITSCH:  Your Honor, my quick read of that it

19  says that:  The Court may downward depart only if the Court

20  finds that there exists a mitigating circumstance of a kind or

21  to a degree that has been affirmatively and specifically

22  identified as a permissible ground of downward departure in

23  the sentencing guidelines.

24       THE COURT:  All right.  I think that's right.  And

25  in your view it wouldn't be applicable here?

22

1          MS. BRITSCH:  I'm not sure, Your Honor.  I believe

2     it may be but it sounds to me that the Court would have to

3     identify a specific ground of departure as outlined in other

4     sections of the guidelines.  And thus far the only one that's

5     been discussed is diminished capacity.  And the Government

6     feels strongly that that simply is not the case here.

7          THE COURT:  What do you think should be done with

8     respect to autism in this case?

9          MS. BRITSCH:  Your Honor, I believe that, although

10    it did take some months, that the BOP has taken substantial

11    efforts to evaluate Mr. Smith and accommodate him.  We've

12    provided --

13         THE COURT:  No, they haven't done anything with Mr.

14    Smith yet.  But what I'm going to do is pronounce a sentence

15    today and I'm going to recommend strongly, that he be

16    sentenced to serve his time in the skills program and then if

17    that designation does not come, I'm going to vacate the

18    sentence.

19         MS. BRITSCH:  Understood, Your Honor.

20         THE COURT:  In other words, they're going to do it.

21         MS. BRITSCH:  Yes, and we agree that the skills

22    program is very appropriate for Mr. Smith and --

23         THE COURT:  No, but I'm not going to sentence him to

24    15 or 20 years in the skills program.

25         MS. BRITSCH:  We understand that as well, Your

23

1    Honor.

2              THE COURT:  Now, what would -- you've got a 5K1 --

3    5K1.1 departure, and is -- his cooperation was substantial and

4    I can depart a long ways from there, down to what I would

5    generally or what I would do in this case.  The program is

6    about 18 months.

7              MS. BRITSCH:  That's correct, Your Honor.

8              THE COURT:  And I would intend to consider imposing

9    a sentence in the 18 to two months -- or 24 months range for

10   his -- for his being in the skills program.  And I would

11   depart downward under 5K1.1 to achieve that.

12             Would the Government have any problem with that?

13             MS. BRITSCH:  Yes, Your Honor.  The government

14   believes that sentence is far too low given the seriousness of

15   this offense.

16             THE COURT:  Well, what am I going to do with having

17   him in the general population?  I'm not going to tolerate

18   that.

19             MS. BRITSCH:  Yes, Your Honor.  Well, as explained

20   by Dr. Allison Leukefeld in the declaration filed with our

21   sentencing paper, and I would note for the Court that Dr.

22   Leukefeld is present today --

23             THE COURT:  Oh, wonderful.

24             MS. BRITSCH:  -- if the Court would like to ask

25   questions.

24

1          THE COURT:  Yes, I would.  Does he or she know about

2    the skills program?

3          MS. BRITSCH:  Yes, Your Honor.  She's very familiar

4    with the skills program.  She's chief of mental health

5    services at the Bureau of Prisons and has been very involved

6    in reviewing the materials related to Mr. Smith and helping

7    all of us understand the skills program.

8          THE COURT:  She wasn't one of the people who wrote

9    back a day after getting a box full of documents saying --

10          MS. BRITSCH:  She was not, Your Honor.

11          THE COURT:  That was a kind of insulting response

12    and they should know that.

13          MS. BRITSCH:  Yes, Your Honor.

14          THE COURT:  All right.  Yes, I think hearing from

15    her.  Mr. Zwerling, you have any objection?

16          MR. ZWERLING:  No, Your Honor.

17          THE COURT:  Have you had any contact with her?

18          MR. ZWERLING:  Just saying "hello" outside.

19          THE COURT:  All right.  Yes, I would like to hear

20    from her.  She clearly is knowledgeable in this area and she

21    knows now having listened what my concerns are.

22          MS. BRITSCH:  Yes, Your Honor.

23          THE COURT:  But I'm probably not going to be moved

24    by you, Ms. Britsch, about how far I can depart.

25          MS. BRITSCH:  Understood, Your Honor.  Would you

25

1    like to hear from her now?

2           THE COURT:  Yes.

3           MS. BRITSCH:  Okay.

4           THE COURT:  Come forward and take the oath.

5    (A brief interruption in the proceedings.)

6           THE COURT:  All right.  You may administer the oath

7    to her.

8           Thereupon,

9                         **ALLISON LEUKEFELD,**

10   having been called as a witness on behalf of the Court and

11   having been first duly sworn by the Deputy Clerk, was examined

12   and testified as follows:

13          (Witness Seated.)

14          THE COURT:  All right.  Ms. Britsch, go ahead.

15   Although I want to ask her some questions at the outset.

16          MS. BRITSCH:  Yes, Your Honor.  If the Court would

17   like to ask questions, then the Government may have some

18   follow-up.

19   BY THE COURT:

20   Q.   Tell us your name, please.

21   A.   Allison Leukefeld.

22   Q.   I'm sorry.

23   A.   Allison Leukefeld.

24   Q.   Would you spell your last name for the court reporter?

25   A.   L-e-u-k-e-f-e-l-d.

26

1   Q.   Ms. -- Dr. Leukefeld, I'm an old man.  My hearing isn't

2   what it once was.  You'll have to speak up a bit for me.

3              Would you tell us for whom you work and what you do?

4   A.   I work at the Federal Bureau of Prisons where I'm a

5   psychologist.  I work in the central office as the chief of

6   mental health services.

7   Q.   And where is that located?

8   A.   Right here in Washington, D.C.

9   Q.   And how long have you been employed by the Bureau of

10  Prisons?

11  A.   I've been employed by the Bureau of Prisons since 2002

12  and I've worked in my current position for the last eight

13  years.

14  Q.   Are you a medical doctor?

15  A.   No, I am -- I have a Ph.D. in psychology.

16  Q.   All right.  And what, if any, have you had any contact

17  with Smith -- Milton Smith matter before today?

18  A.   Before today I've reviewed some documents and had some

19  conversations with the attorneys, written some materials, I

20  believe for the Court, to describe the skills program.

21  Q.   All right.  Are you aware that the volume of materials

22  submitted to the Bureau of Prisons at my request has got to be

23  over a foot-and-a-half of documents?

24  A.   I was not the recipient of all of those documents.

25  Q.   That began when he was even younger than six years old.

27

1          Are you aware that he has been diagnosed, not

2   originally, but as our awareness of autism has progressed,

3   that he was finally diagnosed with an autism spectrum

4   disorder?

5   A.   I am aware.  I was able to read Dr. Rohrer's report.

6   Q.   Have you interviewed Mr. Smith at all?

7   A.   I have not.

8   Q.   Now you know what I'm concerned about.  And let me be

9   explicit.  I am concerned that Mr. Smith would be unusually

10  exceptionally subject to and vulnerable to the general prison

11  population.  He could be easily taken advantage of and he

12  doesn't belong in the general population.  Sentences the Court

13  imposes are punishment but we don't sentence people to suffer

14  abuse by other prisoners.  And yet we know that happens in

15  some of our prisons.  And we know that it happens in

16  specifically with particularly susceptible people.  And that's

17  my concern.  And so that's why I have focussed on the skills

18  program.

19          What, in your view, is the proper placement for Mr.

20  Smith?

21  A.   I would agree that Mr. Smith would appear to be a very

22  appropriate referral to the skills program.

23  Q.   And, of course, you say that somewhat cautiously because

24  you haven't yourself looked at all of the records and you

25  haven't made that determination?

28

1    A.    And because I haven't interviewed him and the skills

2    program is a voluntary program so we like to explain it to

3    people and let them understand what it is that they're going

4    to be engaged in before we agree and they agree.

5    Q.    All right.  I take your presence here today is chiefly to

6    describe the skills program?

7    A.    Yes, sir.

8    Q.    Not to make any final determinations about Mr. Smith?

9    A.    Yes.

10   Q.    Is that right?

11   A.    That's right.

12   Q.    All right.  Tell us what you'd like to tell us about the

13   skills program.

14   A.    Sure.  The skills program is a residential mental health

15   program.  And it provides services to male inmates in the

16   Bureau of Prisons.  We have two skills programs.  One at a low

17   security facility, one at a medium security facility.  And in

18   that residential program, participants live together on the

19   unit.  I want to be clear that they do have access to the

20   general population and they may go to general populations for

21   things like meals and recreation or education or chaplain

22   services, but they reside together on a residential unit where

23   they participate in treatment.

24         And that treatment may involve social skills

25   training type activities that is both sometimes taught in

1   terms of didactic skill, but then also very frequently learned

2   through just social interaction and coaching and that kind of

3   thing.  It also involved some cognitive behavioral treatment

4   so participants are learning about how to better manage their

5   emotions.  And all the participants live together in a

6   modified therapeutic community.  And so in that sense they're

7   encouraging one another to learn and utilize the skills that

8   the program is teaching.

9   Q.   What steps would you take or are taking to protect

10  vulnerable residents of the skills program from the predatory

11  folks that are in the general population?

12  A.   That is a concern.  We want to make sure that the skills

13  program is a safe place, safer even than other units in the

14  prison.  Although the goal is to have every part of the prison

15  be safe.  In order to do that the skills program has

16  additional staff working on the unit.  Typically a

17  psychologist is the coordinator of the program and their

18  mental health treatment specialist that work on the skills

19  unit as well.  And then special attention from the education

20  department.

21          And in addition the skills program uses inmate

22  companions who are peers.  Those are specially screened

23  inmates who aren't necessarily participants in the program but

24  who live on the unit and are supportive to the goals of the

25  program, prescreened and carefully supervised.

30

1   Q.   If Mr. Smith were designated to skills, and participated

2   in the program successfully, because he would have to be

3   successful for the 18 months, would he then be eligible to

4   continue to serve as a peer?

5   A.   Yes, absolutely.

6   Q.   How long could he serve as a peer?

7   A.   Participants who do well in the program are able to

8   continue to live on the unit indefinitely following the

9   conclusion of their formal participation and they might live

10  on the unit just by virtue of having completed the program or

11  if they are appropriate and have learned the skills well

12  enough that they would be supportive to other participants,

13  they could continue on as a peer, which is an employed

14  position.

15  Q.   All right.  I think you've addressed as you know my chief

16  concern is that some persons are particularly vulnerable to

17  the predatory types that are in the general population.  And

18  I -- I think Mr. Smith falls in that vulnerable category.  And

19  that's my concern here.

20          All right.  Ms. Britsch, do you have any questions

21  for this witness or Ms. McCormick?

22          MS. MCCORMICK:  Just a few brief ones, Your Honor .

23                     **CROSS-EXAMINATION**

24  BY MS. MCCORMICK:

25  Q.   Dr. Leukefeld, are there any beds available in the skills

31

1   program at -- you said there were two facilities?

2   A.   Yes.  I checked specifically in regards to the low

3   security facility and there is not a significant waitlist.

4   The waitlist would not be an impediment.

5   Q.   And that's the low skill -- the low security facility is

6   which facility?

7              THE COURT:  Could you speak up, please?  I'm having

8   a hard time and I want the folks in the courtroom to be able

9   to hear you as well.

10              THE WITNESS:  The low security facility is FCI

11  Danbury and there is not a significant waitlist there that

12  would delay Mr. Smith's participation should he be appropriate

13  and volunteer for the program.

14  BY MS. MCCORMICK:

15  Q.   And what steps have been taken already by the Bureau of

16  Prisons relating to Mr. Smith's potential admission to the

17  skills program?

18  A.   So I've certainly reviewed his file and would agree that

19  he's an appropriate referral.  And if he is sentenced, we

20  could certainly go ahead and place what we call a psychology

21  alert on his file, which is an electronic marker that would

22  ensure that he would be seen immediately upon his arrival at

23  an institution but a doctor level psychologist who would

24  assess him.  So that's something else we could do to prepare

25  and be certain that -- that we know he's coming and that the

32

1  appropriate care is taken.

2  Q.   And was there any other sort of red flag that was placed

3  on Mr. Smith that you discussed in your declaration?

4  A.   The other option for a red flag so to speak would be a

5  judicial recommendation.  And if the Court decides to make a

6  recommendation for the skills program, that would alert our

7  Grand Prairie where designations are made.  So that his file

8  would essentially be routed through a psychologist and --

9         THE COURT:  Well, I feel fairly strongly about it.

10  In fact, as I indicated to you if he doesn't get in, I am

11  going to vacate the sentence.  But that's as strong as I can

12  make a recommendation, but your testimony has helped me

13  understand it and gives me some confidence that it's an

14  appropriate place for Mr. Smith.  Go ahead, Ms. McCormick.

15         MS. MCCORMICK:  And just to explain for the Court in

16  your declaration you indicated that there could be no

17  guaranteed admission to the skills program at this point, is

18  that correct?

19         THE WITNESS:  That is correct.

20  BY MS. MCCORMICK:

21  Q.   And why is that?

22  A.   Should Mr. Smith be able to be designated directly to a

23  skills institution, one of the earlier concerns is that we

24  would want to make sure that there were no separatees at those

25  institutions.

33

 1          THE COURT:  No, what?

 2          THE WITNESS:  No separatees.  No one that he should

 3   perhaps be kept away from for safety concerns.  And I don't

 4   have access to that information, but we wouldn't -- there are

 5   certain people that we don't put together in the same

 6   institution and I don't have a way of knowing that.

 7          THE COURT:  We don't know of any either.  Do we,

 8   Ms. McCormick?

 9          MS. MCCORMICK:  Well, Mr. Smith was the -- he did

10   testify at a cooperators --

11          THE COURT:  Oh, yes.

12          MS. MCCORMICK:  -- trial.

13          THE COURT:  I doubt seriously whether any of those

14   other folks are in the skills program.

15          MS. MCCORMICK:  No, Your Honor, and we can review

16   the record because I believe there was a recommendation for

17   that particular person.

18          THE COURT:  You're quite right.

19          THE WITNESS:  So that's one reason that we might not

20   commit to his placement prior to sentencing.

21          In addition, the psychologist at the skills program

22   would want to interview him and have the opportunity to both

23   make an independent assessment and also, like I said before,

24   ensure that once he understands the rules of the program and

25   the concepts and what he'll be participating in, that he

34

1    agrees to participate.

2    BY MS. MCCORMICK:

3    Q.   And is the sentence an important thing for the Bureau of

4    Prisons to know before they could make a designation to the

5    skills program?

6    A.   I think it is.  That's not my area of specialty, but the

7    sentence will in part guide what types of security levels he's

8    appropriate for.  And so it's difficult to say which

9    institution he would be able to go to prior to sentencing.

10   Q.   For example, is there a skills program in a high security

11   facility?

12   A.   There is not.

13   Q.   So you would need to know the sentence to know that

14   before you could discuss whether skills admission would be

15   possible?

16   A.   Yes.

17   Q.   Dr. Leukefeld, outside of the skills program, if Mr.

18   Smith completed it, would he be -- would he be assessed

19   differently with respect to his care level?

20   A.   No.  Care level is decided independent of program

21   participation.  So in -- an individual's care level is based

22   on their need for mental health services.  And he would be

23   eligible for a variety of services, which might be residential

24   care in the skills program, it might be nonresidential

25   psychology services in a different context.

35

Q.   And what's the typical care level for somebody in the
skills program?

A.   Typically individuals in the skills program are care
level 3.

Q.   And if somebody with a care level 3 assessment completed
the skills program, what would happen to them next?

A.   A variety of things.  Typically they would remain care 3
because the types of issues that we treat in the skills
program are long term disorders or illnesses that are not
likely to go away, follow any treatment, it's more of an issue
of management and support.  So care level would remain 3.  And
at that point they could continue to live on the skills unit
as a resident as someone who has completed the program.  They
could continue to live on the unit as somebody who goes on to
mentor or support other participants in the skills program and
is paid and supervised in that role.  Or they might wish to
move to another prison and petition their case management for
that perhaps to get closer to home, that kind of thing.  Or
they could move into the general population and receive
services in that setting.

Q.   And if they did make that decision to petition to change
to a new environment, would that change the -- how would that
change the level of care if you were still assessed a care 3?

A.   It would not change the level of care.  The Bureau of
Prisons has doctor level psychologists at every institution to

36

1  provide care.

2          THE COURT:  Because many of these conditions are not

3  curable.  They don't pass away, you just learn new coping

4  mechanisms.

5          THE WITNESS:  Yes.

6          THE COURT:  Next question.

7  BY MS. MCCORMICK:

8  Q.   So, for example, you discussed the risk --

9          THE COURT:  I'm sorry.  You nodded "yes."  Did you

10 agree with my observation?

11         THE WITNESS:  Yes, that many conditions are ongoing.

12 And we would continue to provide care.  We wouldn't stop at

13 the conclusion of a residential program.

14         THE COURT:  All right.  Next question.

15 BY MS. MCCORMICK:

16 Q.   So going back to the scenario where a person petitions

17 after they're a care level 3, they petition to leave the

18 skills program to go to another prison population, and what

19 happens if that person then gets bullied or targeted in that

20 population?

21         THE COURT:  Against what?  I'm sorry.

22 BY MS. MCCORMICK:

23 Q.   Bullied or targeted for manipulation?

24 A.   A variety of things would happen.  I think if someone was

25 a care level 3 inmate in one of our institutions, they would

37

1   have a variety of ways to address bullying or potential

2   victimization.  As a care 3 individual, they would be having

3   weekly contact with a psychologist.  And so that is someone

4   who should be seen as an ally through the treatment

5   relationship.  That's one person they could go to.  Every

6   inmate has a unit team that's a case manager and a counselor

7   who works on their housing units and those people are very

8   much intended to be support and, therefore, to protect the

9   safety.  Of course they could always go to an officer or to

10  the lieutenant's office.  So there are a variety of avenues by

11  which an individual could ask for help.

12             THE COURT:  Would you be surprised to know that most

13  courts, including this one, are inundated with claims from

14  inmates who have been abused or otherwise attacked by other

15  inmates who was threatened?

16             And these avenues that you describe are all

17  important and useful, but as a practical matter, it doesn't

18  eliminate it at all.  Is that your experience too?

19             THE WITNESS:  Not necessarily.  My experience in

20  that regard varies.  Many inmates are able to live a safe and

21  productive life while they're incarcerated.  And that -- and

22  that sometimes assaults do occur.

23             THE COURT:  Next question.

24  BY MS. MCCORMICK:

25  Q.   So one of the concerns with autism is that maybe the

38

1  individual doesn't interpret social cues or understand

2  directions in the way that other people would, is that

3  correct?

4  A.   That is.

5  Q.   So one concern might be that if somebody with autism is

6  in the Bureau of Prisons and they misunderstand a direction

7  from a guard, that maybe that person would be unfairly put in

8  isolation or a special housing unit, is that right?

9  A.   That would be a concern, yes.

10  Q.   And if somebody with a care level 3 designation is put

11  into a unit like that, is there any special programs in place

12  to ensure that they don't just stay there forever or are

13  mistreated?

14  A.   Yes.  The Bureau, especially recently, has been very

15  concerned with the issue of restricted housing in general and

16  especially restricted housing for individuals with mental

17  illness.  And so a number of new procedures have been put in

18  place in order to guard against individuals with mental

19  illness spending extended periods of time in restrictive

20  housing.  And one of those is that somebody who is identified

21  as needing care level 3 services, should they be placed in

22  restrictive housing, a psychologist would come and interview

23  them within the first 72 hours of their stay there.  And --

24  and that --

25            THE COURT:  I take it you've interviewed autistic

39

1    people?

2             THE WITNESS:  Yes.

3             THE COURT:  Is that a very fruitful thing to do?

4    And I tell you that because in my family I have two autistic

5    -- my wife has two autistic nephews.  I don't know where they

6    are on the spectrum as compared to this young man, but

7    interviewing them would be futile.

8             THE WITNESS:  I think the goal of this particular

9    interview is one to ask how someone is doing, to ask questions

10   and have a dialogue, but it's also the psychologist would come

11   armed with a record and the diagnosis and having an

12   understanding who that person is from their interactions with

13   them over time, and having an understanding of their needs,

14   and then looking -- interviewing the individual, also talking

15   with staff who are in the special housing unit and trying to

16   get a sense of the current distress and what could be done to

17   ameliorate that and whether additional steps need to be taken

18   immediately or put a plan in place and what the timeline for

19   that plan would be.

20   BY MS. MCCORMICK:

21   Q.   And the last question is you reviewed -- what did you

22   review before you provided your declaration to the Court?

23   A.   I reviewed Dr. Rohrer's report and I also reviewed a

24   court transcript.  I believe from May of 2016.

25   Q.   Did you also review the PSR?

40

1   A.   I did not.

2   Q.   Were you able to form an opinion as to whether Milton

3   Smith is an appropriate candidate for the skills program?

4   A.   I do think he is a very appropriate referral.  He's the

5   kind of person that we look for in prescreening to move toward

6   the skills program and to interview upon their arrival.

7   Q.   And based on the work that you've done in preparing a

8   declaration for this hearing, would you able to form an

9   opinion as to whether he'd be likely to be accepted into the

10  program?

11  A.   I do think he would be likely to be accepted.

12          MS. MCCORMICK:  That's it, Your Honor.  Thank you,

13  Dr. Leukefeld.

14          THE COURT:  Mr. Zwerling.

15          MR. ZWERLING:  Yes, Your Honor.

16                    **CROSS-EXAMINATION**

17  BY MR. ZWERLING:

18  Q.   Is it fair to say that someone who graduates from the

19  skills program doesn't have to initiate a request for a

20  transfer in order to be transferred to another unit or another

21  prison?

22  A.   That is true.  The unit team could potentially initiate a

23  transfer for a variety of reasons.

24  Q.   So there's no guarantee that Mr. Smith, upon graduation,

25  would stay in the skills program as a mentor or, if he was,

41

1  how long he would be allowed to be a mentor before he would be

2  moved out?

3  A.   There's no guarantee that he would stay.  However, upon

4  his completion of the skills program, his psychology treatment

5  team, the coordinator and the team of the skills program would

6  make recommendations at that point and the team is unit based,

7  the mental health team is unit based just like the unit team.

8  And so there's ample opportunity for coordination and

9  collaboration in regards to placements and working together.

10 Q.   What is the longest postgraduate of the skills program

11 has -- a person who has graduated been allowed to stay on as a

12 peer?

13 A.   That's an excellent question and I don't know the answer

14 to it.

15 Q.   All right.  And going to the situation where someone with

16 autism is no longer in the skills program or in the skills

17 unit, you indicated there were three different ways they could

18 respond to being bullied or victimized by other inmates and

19 one was, once a week to see a psychologist or a psychiatrist?

20 A.   Well, they would have a relationship with that

21 psychologist from weekly meetings, but they could come to see

22 them at any point.  They wouldn't have to wait until the next

23 meeting to make contact.

24 Q.   And then the psychologist could do what?

25 A.   The psychologist would be well versed in the procedures

42

1  for the institution and would probably assist the inmate in

2  reporting the concern to correctional services.

3  Q.   Okay.  So once it went to the correctional services, then

4  they would have to investigate it and -- and intervene in some

5  way to make sure it didn't happen again, correct?

6  A.   Yes.

7  Q.   And so that wouldn't be done in secret, correct?

8  Everybody in the unit would know about the fact that it had

9  been reported by the victim and that the bully was being

10  disciplined?

11  A.   You know, I don't work for correctional services and so

12  I'm not sure all of the strategies that they might use to

13  address that.

14  Q.   Would it be fair to say you don't know that -- how people

15  who report things in a prison situation are treated by the

16  fellow inmates when they report somebody else?

17  A.   I mean I couldn't speak to every situation in how those

18  different situations play out.

19         MR. ZWERLING:  And I have no further questions, Your

20  Honor.

21         THE COURT:  Ms. McCormick, anything further?

22         MS. MCCORMICK:  No, Your Honor.

23         THE COURT:  Thank you for your testimony.  It's been

24  very helpful.  Maybe the time that I took to focus on

25  sentencing might have been shortened if I had more

43

1  information.  But this is truly exceptional.  We understand

2  very little about autism.

3           THE WITNESS:  Yes, I think we're still learning a

4  lot about autism.

5           THE COURT:  And in fact, the various levels have

6  changed over the years.

7           THE WITNESS:  Even the DSM and the names of

8  disorders have changed recently.

9           THE COURT:  But it isn't a condition that isn't ever

10  going to go away, is it.

11           THE WITNESS:  It's a long term disability

12  essentially, yes.

13           THE COURT:  All right.  Well, I appreciate very much

14  your coming and testifying.  It's been very helpful.

15           THE WITNESS:  Thank you.

16           (Witness excused.)

17           THE COURT:  All right.  We're now at the point,

18  still of the downward departure allocution and the imposition

19  of sentence.  And I'm going to -- let me ask Mr. Zwerling, do

20  you advocate any other bases for departure other than 5K1.1?

21           MR. ZWERLING:  Your Honor, I'm not sure that

22  whether 5K2.0 would apply or not, because even if it didn't, I

23  think 3553 is certainly an area that the Court could --

24           THE COURT:  Yes, that's not a departure, that's a

25  variance.

44

1      MR. ZWERLING:  Right.  I understand that, Your

2 Honor.  I was trying to make that distinction, but I think you

3 can get to the same place either way.

4      THE COURT:  All right.  Thank you.  I am going to

5 recess this matter and I am going to hear the -- first of all,

6 the FireClean matter.  And I will return to this at -- let's

7 make it three o'clock.  At which time I will complete this

8 sentencing and go on either to Ulrich or to a plea.  Maybe I

9 can do both of them from now until three o'clock.  So let's do

10 FireClean.

11      MS. BRITSCH:  Your Honor, may Dr. Leukefeld be

12 dismissed at this point or would you like her to return at 3?

13      THE COURT:  No, no.  She may be -- where is she?

14 Yes, she may depart and again, thank you.  You can understand

15 why courts need this kind of information.  It's very important

16 in very, very, very few cases.  And I don't, by any means,

17 mean to suggest that the Bureau of Prisons isn't doing the

18 best it can in these areas, but prisons are tough places and

19 there are predators.  In fact, most people there are predators

20 and that's what has caused me to be so concerned about this,

21 because I get almost as many documents as you've seen in this

22 case, I get from inmates complaining about everything from

23 beatings to rape.  Not by guards, by other inmates.  And the

24 instances of coercion, extortion, and all that sort of thing

25 are enumerable.  They're not nice places despite the

45

```
 1   significant efforts of the Bureau of Prisons.

 2           Thank you.  Yes, she may depart.  Thank you,

 3   Ms. McCormick.  I thought that was a wise step for you to

 4   take.  It has helped.  Thank you.

 5           MS. MCCORMICK:  Thank you, Your Honor.

 6           THE COURT:  All right.

 7               (Proceedings recessed at 2:31 p.m.)

 8                   P R O C E E D I N G S

 9   (Resumed at 1:30 p.m.)

10           THE DEPUTY CLERK:  United States versus Milton

11   Smith, Jr.  Criminal case number 1:15-CR-42.

12           THE COURT:  Oh, and while you're coming, I'm going

13   to take a brief recess.  And after this I will do the Ulrich

14   matter.  And that will complete the docket for today I

15   believe, is that right?  And a plea.  I'm sorry.  Are counsel

16   here on the plea?

17           UNIDENTIFIED SPEAKER:  Yes, Your Honor.

18           THE COURT:  Oh, again, I apologize to you.

19           UNIDENTIFIED SPEAKER:  Not a problem, Your Honor.

20           THE COURT:  But we'll do it as soon as I finish

21   Ulrich.  So we'll do this and Ulrich and then the plea.

22           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

23           THE COURT:  The Court stands in recess for five

24   minutes.

25           (Recess.)
```

46

1          THE COURT:  All right.  We're now at the point of

2    allocution.  Mr. Smith, this is your opportunity to address

3    the Court.  You don't have to say anything if you don't wish

4    to but you have that opportunity.

5          Mr. Zwerling, have you discussed that?

6          MR. ZWERLING:  I have, Your Honor.  I believe Mr.

7    Smith would like to say something to the Court.

8          THE COURT:  All right.  Would he prefer to go first

9    or after you?

10          MR. ZWERLING:  I think first, Your Honor.

11          THE COURT:  I beg your pardon?

12          MR. ZWERLING:  I think first.

13          THE COURT:  All right.  I'll hear from you now, Mr.

14    Smith.

15          THE DEFENDANT:  During the time of the offense --

16          THE COURT:  Can you speak up for me please, Mr.

17    Smith.

18          THE DEFENDANT:  Yes.

19          THE COURT:  My hearing isn't as good as yours.

20          THE DEFENDANT:  During the time of the offense, I

21    believe I was on the wrong path.  I mean, I am really

22    embarrassed about my behavior and I apologize to the victims.

23    And that's all.

24          THE COURT:  All right, sir.  You may be seated.

25          Mr. Zwerling.

47

1          MR. ZWERLING:  Your Honor --

2          THE COURT:  I'll give you the last word after the

3  Government has been heard.

4          MR. ZWERLING:  First of all, I really would like to

5  thank and commend the Court for taking the time to get to the

6  bottom of the situation with the Bureau of Prisons and its

7  sensitivity to the unique situation that Mr. Smith presents.

8          I have to admit when he first came into my office, I

9  was terrified about the case because of a prior experience

10  with a young man with autism who didn't fair so well and was

11  sent to general population in a child pornography case out of

12  the Western District.

13          The Court has focused in on the hardships that

14  someone like Mr. Smith will face in the general population and

15  he will have three strikes against him should he ever wind up

16  there.

17          One is his being a sex offender with children.

18          Two, if it becomes known he was a cooperator.

19          And three, because of his disabilities and his --

20  the way he will interact with people and guards and everybody

21  else.

22          And on top of that, he doesn't have all the tools to

23  cope with those bad situations that most inmates do and many

24  of them don't fair well even if they don't have disabilities.

25  So we're concerned about keeping him out of general

48

1  population.

2         We would argue that the 50 percent downward

3  departure is insufficient in this particular case,

4  irrespective of Mr. Smith's personal disabilities.  He was

5  arrested early on in this investigation and began cooperation

6  immediately.

7         His cooperation led to the Government's ability to

8  get search warrants for the computers of co-defendants, people

9  who became co-defendants in the case, by explaining to them

10  whose username belonged to where and matching it up with the

11  various IP sites.

12         Then once the Government had made a series of

13  arrests and seizures and got their case together, he was given

14  the opportunity, and I thank the Government for this because

15  we didn't know whether he would ever be a witness at a trial,

16  but the opportunity to testify at his own grand jury and

17  testify against himself at that grand jury, which in my

18  experience is unique.  I've never seen that before.

19         Then he continued to cooperate with them and

20  eventually was able to, through hard work by the U.S.

21  Attorneys, be able to testify straightforward and honestly at

22  a trial and be cross-examined.  Fortunately, it wasn't a tough

23  cross-examination, but it was still an ordeal for him and it

24  still was valuable to the Government.

25         So all of that put together I think is worth more

49

1   than 50 percent.  I've seen other 50 percent downward

2   departures that did not involve any or near that type of

3   substantial assistance.

4          And we would also argue for a variance because of

5   his mental disabilities, because of the really diminished

6   capacity.  And if it was available as a departure, I think the

7   Court would have been well grounded in granting it.  But since

8   it's not, the Court can still accomplish the same or similar

9   outcome through use of a variance.

10          And I'm not going to repeat all the things that have

11  been in the pleadings.  The Court I know has studied those and

12  I don't want to be repetitious.

13          The last thing I would like to point out to the

14  Court though, is the skills program being relatively -- well,

15  two things.  The skills program being relatively new, no one

16  really knows what's going to happen to him a week, a month or

17  two after he finishes it, how long he'll be allowed to stay

18  there.  There's no answer to that.  The Court was not given

19  one.

20          And it clearly was in the realm of possibility, and

21  I would say probability, that eventually if he had any kind of

22  a lengthy sentence, he would wind up in a general population

23  somewhere and we all fear that.

24          The last thing, Your Honor, is that Mr. Smith is

25  very concerned.  He's never functioned on the outside by

1   himself.  He's never lived on his own.  I think the Government

2   paints with a too bright a brush his experience in the dating

3   world.  I think in one of the psychiatric reports,

4   psychological reports, it's clear that what that entailed is

5   women who were involved with the other band members, that

6   people producing music with him may have flirted with him and

7   then taken his money and his equipment and disappeared on him.

8   Eventually that caused him to move back in with his family and

9   give all of that up.

10         And so he really doesn't have experience with women.

11  I think that that also came out in the interviews by the

12  psychologists.  He has been in special needs in education from

13  the very beginning.  He was given different types of

14  treatments for different types of diagnoses.  None of it

15  worked.  His mom is concerned that they put him on some

16  medications, because he doesn't do well on medications.  He's

17  been doing much better now that he's off of medications.

18         You never know what's going to happen in the Bureau

19  of Prisons.  They may think that the earlier diagnoses were

20  correct.  Who knows.

21         But when he -- then he went through --

22         THE COURT:  You mean the schizophrenia.

23         MR. ZWERLING:  Pardon?

24         THE COURT:  You mean the schizophrenia.

25         MR. ZWERLING:  Yeah, exactly.  And so --

51

1          THE COURT:  He was on a lot of medications which

2     appeared, if you looked at all of the records, ultimately were

3     not helpful.

4          MR. ZWERLING:  They were harmful because it made him

5     aggressive at times, some of them.  And then he got in trouble

6     for being aggressive.  And it just, you know, was going down

7     the wrong way.  He was in a boarding school for people with

8     problems through high school.  That's how he got --

9          THE COURT:  There was abuse at that boarding school.

10         MR. ZWERLING:  And he was abused in that boarding

11    school.

12         THE COURT:  Yes, I'm familiar with that.

13         MR. ZWERLING:  I know you are, Your Honor.  I don't

14    mean to be repetitious.

15         So, when he gets out of prison, whenever that is,

16    he's going to be dependent on his parents for as long as

17    they're able to take care of him.  You know, he's --

18         THE COURT:  Well, let me say I think they've done

19    quite a remarkable job thus far.  He's very fortunate to have

20    parents --

21         MR. ZWERLING:  He is.

22         THE COURT:  -- who have cared for him as they have

23    these many years and he has siblings that have been

24    challenging for his parents too.

25         MR. ZWERLING:  That's correct, Your Honor.  And he

52

1    realizes that and he appreciates that, but he's fearful that

2    they're getting older and what's going to happen.  And so we

3    think it's important that he get out in time when there's

4    still -- you know, they're now in their mid-'60s.  To me,

5    that's young.  To him, it's not so young.

6            To be able to help him get established for the day

7    that they're not able or available to do that for him and that

8    day will come.  To help him get employment, figure out the

9    type of employment he can do, so he can earn enough money.  To

10   find out if there are people similarly situated that can

11   form a group.  Whatever it is, he's going to need time in

12   order to be able to survive when released.

13           And so we're hoping that the Court will fashion a

14   sentence that is not greater than necessary to accomplish

15   everything that -- I think everybody wants for him which is an

16   ability upon release to be able to survive in a meaningful and

17   appropriate and law abiding way.

18           Thank you.

19           THE COURT:  All right.  Ms. Britsch.

20           MS. BRITSCH:  Thank you, Your Honor.  Your Honor,

21   the Court has heard from Dr. Leukefeld about the skills

22   program.  The skills program is an appropriate program for Mr.

23   Smith, so I won't go into any more detail on that.

24           But what I would like to discuss with the Court is

25   the seriousness of the offense committed by Mr. Smith.  Mr.

53

1    Smith was an integral part of a sophisticated online

2    conspiracy that targeted children.  The conspiracy involved

3    extensive deception and specialized roles that enabled the

4    defendant and his cohorts to accomplish their criminal goals.

5            By his actions Mr. Smith hurt real children, over

6    300 of them.  The harm these children and their parents --

7            THE COURT:  Well, let's be clear about that.  He

8    personally didn't hurt 300 children.  Let's be clear about

9    what he's charged with.  He was in a conspiracy.  And he's

10   chargeable with what's reasonably foreseeable.  And it was --

11   and you're absolutely right, this is very serious conduct.

12           But I think -- I find it difficult, given what I

13   think I know about this defendant now.  I don't know how much

14   time you've spent with him.  I assume you've spent some since

15   he testified for you in connection with the trial.

16           MS. BRITSCH:  Yes, Your Honor.  And I've also spent

17   time with several victims and their parents who are affected.

18           THE COURT:  I understand that and that can't be

19   overstated.  I agree with that.

20           MS. BRITSCH:  Yes, Your Honor.  And the FBI

21   estimates that there are over a thousand children who were

22   targeted by this conspiracy.  They've only been able to

23   identify 350.

24           THE COURT:  I understand that.  That's why I've

25   imposed serious sentences on the previous defendants.  This is

54

1    different.  I don't know how much I'm trying to impress that

2    on you.

3          MS. BRITSCH:  Your Honor, and the Government agrees

4    it's different.

5          THE COURT:  All right.

6          MS. BRITSCH:  That's why we filed our motion for

7    downward departure and we do agree that he is not -- does not

8    deserve a sentence that is the same as his co-defendants.

9          THE COURT:  All right.

10         MS. BRITSCH:  However, we do believe that the

11   seriousness of the harm should be taken into account.  And

12   that the words of the victims and their families should be

13   considered by this Court.

14         THE COURT:  All right.  I quite agree with you and I

15   gave you an opportunity to read some of those in open court.

16   I have read them.

17         MS. BRITSCH:  Yes, Your Honor.  And my intention was

18   to read some excerpts of them.  But if the Court would prefer

19   not to hear them, I will move on.

20         THE COURT:  No, no, you may go ahead.  I've read

21   them all.

22         MS. BRITSCH:  Yes, Your Honor.

23         THE COURT:  I've read them all from the previous

24   sentencings.

25         MS. BRITSCH:  Yes, Your Honor.

1          THE COURT:  But you may read as many as you wish now

2    to remind me.  But I assure you, I have no qualms about

3    concluding that this was a very serious offense.  You have

4    only to look at the sentences I have already imposed to reach

5    that same conclusion.

6          MS. BRITSCH:  Yes, Your Honor.  And I agree that the

7    Court has taken into account, justly taken into account, the

8    seriousness of the offense when sentencing Mr. Smith's

9    co-conspirators.  And the Government only wishes to remind the

10   Court of that seriousness and make sure that that is taken

11   into account for the sake of their victims and families.

12         THE COURT:  Yes, you may do so.  You may read

13   whatever you wish.

14         MS. BRITSCH:  Yes, Your Honor.  I'll just read

15   briefly from three different victim impact statements, which

16   is not the complete set of victim statements.

17         But, for example, as expressed by one parent in a

18   victim impact statement.  Her 11-year-old old daughter was

19   once strong willed, outgoing and full of life.  But now, that

20   child feels worthless and broken.

21         Another parent of a ten-year-old expressed that her

22   family has been fractured by the actions of these

23   co-conspirators.  And that ten-year-old has night terrors and

24   began talking about suicides after she was victimized.

25         A parent of a 12-year-old has spoken specifically to

56

1   the harm Mr. Smith caused in that victim impact statement.

2   Her 12-year-old daughter needs counseling after being coerced

3   to insert objects into herself.  The family fears that videos

4   of their 12-year-old doing these sexual acts will be viewed

5   over and over again.

6           It may be tempting to discount the abuse in this

7   case because it occurred online, but the defendant used online

8   tactics to hide his identity, he deceived these children, and

9   he invaded these children's homes.  Places where they should

10  be safe and secure.  These young victims, as evidenced by

11  their victim impact statements, are riddled with life-altering

12  guilt, shame, insecurity, and fear as the result of the

13  defendant and his co-conspirators' actions.

14          THE COURT:  What are you reading from now?

15          MS. BRITSCH:  That was simply my argument, Your

16  Honor, but the three excerpts --

17          THE COURT:  I thought you were going to read from

18  the impact statements.

19          MS. BRITSCH:  Well, the three examples I read were

20  from three specific victim impact statements.

21          THE COURT:  Well, I don't want you to think I'm

22  limiting you just because I've read them.  If you think

23  reading more of them will have an impact on me, you may do so

24  if you wish.

25          MS. BRITSCH:  Your Honor, I don't think that's

57

1    necessary.  I think those examples highlight the seriousness

2    of this offense.  And in particular, the young age of these

3    victims which makes them vulnerable to people like the

4    defendant.  These victims are as young as eight, and the

5    statements I read were from victims who were 10 and 12 years

6    old.

7              And the Government's position is simply that a

8    sentence of 24 months, as suggested by the defendant, would

9    unjustly discount this very serious harm to these children.

10             The only other point I would like to make, Your

11   Honor, is that one other consideration is the need for the

12   Court to avoid unwarranted sentencing disparities.  As Your

13   Honor pointed out, these other co-conspirators have been

14   sentenced to very serious sentences that took into account the

15   harm.

16             The Government does not believe that Mr. Smith

17   deserves the same sentence as those co-conspirators.  However,

18   he is at least as culpable as those co-conspirators.  Mr.

19   Smith played very important roles in the conspiracy.  He was

20   both a linker and a chatter.  He lured minors to the website,

21   MyVlog, where they were victimized by Mr. Smith himself and

22   others.  And he also chatted directly with minors.  He

23   pretended to be a 14-year-old girl and he played loop videos

24   to coerce the girls to engage in sexual conduct on web camera.

25             I'll just note for the Court that is in the

58

1   statement of facts associated with Mr. Smith's plea.

2            THE COURT:  I'm aware of that as well.

3            MS. BRITSCH:  And the Government's position is that

4   a sentence that is approximately 50 percent off the sentences

5   received by other co-conspirators, that's the 18 to 21-year

6   range, would more than sufficiently account for the

7   differences between Mr. Smith and his co-defendants, as

8   regards the special needs and the Government's motion for a

9   downward departure.

10           Any lesser sentence, particularly one as low as 24

11  months, would create an unwarranted and unjust sentencing

12  disparity in this case.

13           THE COURT:  All right.

14           MS. BRITSCH:  Thank you, Your Honor.

15           THE COURT:  Mr. Zwerling, you want to respond?

16           MR. ZWERLING:  Yes, Your Honor.

17           First, I read the Government's motion for a downward

18  departure of 50 percent based on his substantial assistance.

19  That's what they're recommending now for the substantial

20  assistance and his diminished capacity which means --

21           THE COURT:  No, they're not -- it's not diminished

22  capacity.  He doesn't get that departure.

23           MR. ZWERLING:  No, no.

24           THE COURT:  But I can take into account -- in

25  variance, I can take into account the fact that he is

1   diagnosed, as he is, and I can take into account that he's

2   been in home arrest for almost three years.  I can take all of

3   that into account.

4              MR. ZWERLING:  I misspoke.  I didn't mean to say

5   departure.  What I'm saying is they filed a motion for a 50

6   percent departure based solely on substantial assistance.  Now

7   they're saying the ultimate sentence should be reflected by 50

8   percent less than --

9              THE COURT:  Yes, but they're only saying that based

10  on what they've heard me say and that's their view today.  I

11  understand your point is, look, you asked for 50 percent based

12  on 5K1.  Now you're limiting it.  So essentially what the

13  Government is saying is they don't want any variance beyond

14  the 50 percent.  That's their argument.

15             MR. ZWERLING:  That should have been how I phrased

16  it.  That's what I was trying to say.

17             THE COURT:  That's their argument.

18             MR. ZWERLING:  Yes.  I understand that.  I disagree

19  with that.

20             The other thing is, I would point out, regarding the

21  period of incarceration, and whether the Bureau of Prisons is

22  capable in this case of dealing with Mr. Smith for any really

23  length of time is to look at Dr. Rohrer's -- her report.  She

24  was neutral.  The Court asked a neutral person to do it.  And

25  on page 8 in her conclusion she says, "The Bureau of Prisons

60

1   has the capability and facilities to address Mr. Smith's needs

2   on a short-term basis."

3          And we agree with that.  And that's why we're asking

4   for the skills program.  And we think what the Court had

5   outlined, its thinking on the matter, is appropriate in this

6   case.

7          Thank you.

8          THE COURT:  All right.  Anything further from the

9   Government?

10         MS. BRITSCH:  No, Your Honor.  Thank you.

11         THE COURT:  All right.  I'm going to take a few

12  minutes to reflect on this and hear the Ulrich case.  Let me

13  hear the Ulrich case.

14         (Recess.)

15                  **P R O C E E D I N G S**

16  **(Resumed at 4:40 p.m.)**

17         THE COURT:  All right.  Any reason why the Court

18  should not now impose sentence?

19         MS. BRITSCH:  Not from the Government, Your Honor.

20         MR. ZWERLING:  Not from the defense, Your Honor.

21         THE COURT:  All right.  Mr. Smith, come to the

22  podium, please, sir.

23         Mr. Smith, you stand convicted of a very serious

24  crime, sir.  Very serious.  And I hope you understand that

25  now.  I think there are some indication that you do understand

61

1  that.

2          And the law requires that I consider a variety of

3  factors.  The first thing I must do is to grant the motion for

4  a downward departure, which the Government has moved for that

5  based on your substantial assistance.  And that motion should

6  be granted and I will consider that in imposing a sentence.

7          And I will also -- I'm going to impose a variance

8  sentence because I'm going to consider all the 3553(a)

9  factors.  And then I'm going to state my reasons for the

10  variance factors or for the variance.

11          But I have to consider your personal history and

12  characteristics.  That's the first thing.  And I have

13  considered that.  Indeed, I've spent virtually three years

14  spending an effort to try to be clear about whether the Bureau

15  of Prisons could deal with what you have to contend with every

16  day, your condition of autism.  I think many of your

17  conditions have been misunderstood over the years.  Autism

18  hasn't been well understood.  It isn't well understood today.

19          But I know your personal history and

20  characteristics.  And the presentence report details that and

21  all of these medical records that have been sent to the Bureau

22  of Prisons do as well.  You've also been diagnosed with

23  schizophrenia and several other things.  So I am fully

24  familiar with your personal history and characteristics.

25          I have also considered the nature and circumstances

62

1    of the offense.  And it is true, as Ms. Britsch is at pains to

2    emphasize to me, and she doesn't need to emphasize it, I'm

3    fully familiar with it.  It is a serious crime.  The harm to

4    these children is almost incalculable because their lives are

5    forever stained, scarred as a result of this sort of abuse.

6           I've read all the impact statements.  I am

7    particularly familiar with Vicki.  I've been reading about

8    Vicki for ten years in cases.  And indeed, I think her mother

9    testified in one of the many sentencings I've had.  Many years

10   ago.

11          But in any event, I am familiar.  And Ms. Britsch is

12   entirely correct.  It's a very serious crime and she

13   recognizes that I have imposed severe sentences on those, 18

14   to 21 years on those who committed those crimes.  I actually

15   think that they understood far more clearly than you do what

16   was going on.

17          You know, if we didn't have an Internet, this

18   wouldn't have happened.  There's no way that Mr. Smith could

19   form a conspiracy with people that he met face-to-face because

20   he doesn't have face-to-face dealings with people pretty much.

21          But the Internet exists and there was a conspiracy

22   and it did cause terrible harm to these young people.  Harm

23   that Ms. Britsch correctly points out is even today not fully

24   assessed.  The Government is still looking into the number of

25   victims that may have been involved.  And I take that point.

63

1    I think I take it quite seriously.

2              I have imposed severe sentences and I live with

3    those severe sentences.  I don't advocate for them.  I don't

4    oppose them.  I live with them, because I know what I've done.

5    The Government hasn't done it.  The defendant hasn't done it.

6    I did it.

7              The law also requires that I impose a sentence that

8    promotes respect for the law.  And I think I'm going to do

9    that.  And that provides just punishment for the offense.  And

10   I've thought long and hard about this.  In fact, as Mr.

11   Zwerling knows, almost three years.  In fact, nearly a full

12   three years.

13             And I have gone over in detail why it took that much

14   time.  Chiefly because I was concerned about the Bureau of

15   Prisons' ability to accommodate his handicap.

16             And the Government has done a good job of bringing

17   that to my attention now, although they needed a little

18   prodding from me, a couple of orders and some other things,

19   but they have done it and the witness today I think was

20   helpful.  Although I will point out that she did a good job of

21   explaining to me what the skills program is, I think her

22   knowledge of what prison is really like and what the

23   conditions inside prison are really like is pretty limited.

24   They are rough, rough places.

25             And Mr. Zwerling correctly asked some questions to

1  bring that out and he's argued that, you know, what happens to

2  people who cooperate, what happens to people who complain

3  about this or that, assault or anything else.  I know because

4  I read these pro se complaints every day.  What happens is

5  pretty grim.  And that's why people don't make nearly as many

6  complaints about what happens to them in prison as others do.

7          And I listened to her testimony about what would --

8  what avenues would be open to Mr. Smith.  I do not have much

9  confidence that he would pursue those avenues or have any

10  understanding of them.

11          When I said I reviewed his personal history, for the

12  most part, Mr. Smith has lived at home.  He is blessed by

13  having parents who have taken very good and close care of him.

14  And I want to recognize what a fine job you all have done.

15  He's very fortunate to have had parents who have watched over

16  him as carefully as you have.  And, of course, as you know as

17  parents your task is far from over.  You will in effect be

18  taking care of him for the rest of his life.

19          That's the way it is, isn't it?  Yes, it is.  And

20  the record should reflect that the parents are nodding, which

21  is true.  But he's lived mostly at home.  And which is a

22  reflection of his autism.

23          Now, I also have to impose a sentence, as I said,

24  that reflects the need to deter him and to deter others.  I do

25  not think a lengthy sentence would serve to defer -- deter

65

1    this defendant but I do think a lengthy sentence is needed to

2    deter others.  On the other hand, I have imposed lengthy

3    sentences on others that I would hope the Government has taken

4    steps to publicize because, you know, I don't -- I can't count

5    on there being any general deterrence on any sentences I

6    impose unless they go out to the public.  And the public says,

7    oh, my heavens, if you do this, look what happens.  But too

8    seldom does that happen but I'm sure, Ms. Britsch, you have

9    done or taken some steps in that regard.

10             MS. BRITSCH:  Yes, Your Honor.  The other sentences

11   have been publicized.

12             THE COURT:  Good.  And that will serve general

13   deterrence, as it should.

14             The law also requires that I impose a sentence that

15   does not involve unwarranted discrepancies or unwarranted

16   disparities, rather, not discrepancies, between the sentences

17   imposed on this defendant and others.  And the Government

18   correctly raises that as an important issue in this case given

19   what I have indicated my views are.  And I will address that

20   in a moment because I'm going to impose a variance sentence

21   and, as the law requires, I need to state the reasons for the

22   variance.

23             And the law requires that I consider the guidelines.

24   They're not mandatory.  They're advisory.  And I have

25   considered the guidelines.  They're quite high and I'm

66

1    departing downward for substantial assistance but I'm also

2    going to vary.

3          In the end a sentence is a judgment.  It is not a

4    mathematical exercise.  It is a judgment.  Congress has made a

5    judgment about what the maximums should be and in some

6    instances mandatory minimums and then the Sentencing

7    Commission makes its judgment based on specific factors.

8          And finally, a sentencing judge must make a judgment

9    and that judgment has to recognize the -- the individuality of

10   each defendant of the differences.  Every defendant is

11   different.  Every crime is different.  Every defendant

12   deserves individual consideration.

13         Now, I have decided that you should be committed,

14   Mr. Smith, to the custody of the Bureau of Prisons for a

15   period of 30 months.  You'll be permitted to surrender

16   voluntarily.  Until that time you'll remember -- you'll remain

17   under home confinement subject to all the same conditions.

18   You're to pay $100 special assessment.

19         The reason that I have imposed a variance sentence

20   are several.  First of all, we have spent a great deal of time

21   on his mental situation and on the Bureau of Prisons' ability

22   to accommodate that.  I think the skills program, which I will

23   strongly recommend, and if it's not granted, I may vacate the

24   sentence and we'll start again.  That's how strongly I feel

25   about it.

1          I have personal experience with autism.  I know

2    something about it.  Not because I know anything about it

3    medically.  I don't.  But because I know people with autism

4    and have dealt with them or tried to deal with them,

5    communicated with them or tried to communicate with them, and

6    I know it is a condition that is not well understood and not

7    well tolerated or well accommodated.  So I have varied for

8    that reason.

9          Ms. Britsch has correctly pointed out what a

10   terrible crime this is and correctly pointed out what his role

11   was in this.  It is unclear, to me, and I don't think anybody

12   can know exactly what he understood or didn't understand about

13   what was going on.

14         He's not mentally deficient at all.  I'm sure, Mr.

15   Smith, that you're a smart person.  You have a good mind.  But

16   not everything is connected in your brain.  You understand a

17   lot of things but you don't, I think, communicate well with

18   people.  You're not self sufficient.  You can't be self

19   sufficient.  And I think your parents would underscore that.

20   Am I correct, Mrs. Smith?

21         MRS. SMITH:  You are correct.

22         THE COURT:  He's not capable of living alone, is he?

23         MRS. SMITH:  Not at this time.

24         THE COURT:  No.  I think I have a pretty good

25   picture of you, Mr. Smith, and of your handicap.  And I think

68

1   Ms. Britsch is correct, there is no downward departure that

2   suits it.  That doesn't mean that I agree that there shouldn't

3   be any.  It just means that the law doesn't account for it at

4   this time and I'm bound by that.  I can't depart downward but

5   I can vary.

6          I can also vary downward because you've been in

7   effect in a jail at home.  Home confinement for a period of

8   nearly three years.  You don't get any credit for that from

9   the Bureau of Prisons.  That's appropriate.  That's the law.

10  But I can take that into account.

11         It's been, according to the probation officer, who

12  is still present in the courtroom, it was very rigorous

13  confinement.  He was in effect home.  Now, whether that means

14  a lot to Mr. Smith or not, I don't -- I don't really think he

15  does much more than be at home.  He doesn't go out, as it

16  were.  But in any event, I take that fact into account as

17  well.

18         So I think the disparities between this and the 18

19  to 21-year sentences is very significant but in my judgment it

20  is warranted in this case.

21         We had some testimony because I had hoped that if he

22  completes the skills program that he might stay on as a

23  mentor.  But we know that's a little unlikely.  Because being

24  a mentor means that you have to associate with somebody.  You

25  have to communicate with them.  You have to empathize with

1    them.  I'm not sure that's feasible here.

2           But he will remain in my estimation in essentially

3    segregated class 3 care, which is important.

4           I believe that -- I strongly believe that Mr. Smith

5    would be highly vulnerable as an inmate anywhere close to the

6    general population.  Over the past 30 years that I've been on

7    the bench, I have seen countless cases of abuse by predatory

8    prisoners of people with the ability -- intellectual ability

9    different from that of Mr. Smith, who have not been able to

10   resist it or avoid it.

11          And while I appreciate the witness' testimony about

12   all the things that the Bureau of Prisons does to stop and

13   avoid that, and I think that's good, I know from my experience

14   of dealing with these petitions, they don't always succeed.

15   And indeed, there's much of it that goes on that isn't

16   discovered and isn't reported.

17          And my discussion -- and I have had some discussions

18   over the last 30 years with people sentenced to federal BOP,

19   and that's true.  And he would be a vulnerable person and he

20   would be a person subject to abuse in the general population.

21   And I felt so strongly about that that I've waited this long

22   to impose this sentence.

23          He will be out, if he gets the 85 percent, in about

24   24 months, thereabouts.  That should be skills plus six

25   months.  And then he will go home.

70

1       And I hope from what I understand about the skills

2  program that he will learn some coping factors during this

3  time with the skills program and that that will assist him in

4  adjusting to a law abiding life.

5       Now, I don't think 30 months is enough for general

6  deterrence, but I have these other sentences out there that

7  are enough for that.  And I wouldn't want, Ms. Britsch,

8  anybody to think that I think 30 months in the normal case of

9  one of these conspirators is sufficient.  Everything you said

10  about the seriousness of this case and the harm to the young

11  girls is true, and I accept all of that.  I'm just making an

12  exception in this extraordinarily different case.  But it

13  doesn't mean that I find anything you said to be arguable at

14  all.

15       All right.  I will recommend strongly that he be

16  able to report to the skills program.  There's one in Florida

17  and one in Massachusetts.  But I think the one in

18  Massachusetts was the right one, is that right?

19       MR. ZWERLING:  Connecticut, isn't it?  Danbury,

20  Connecticut, Your Honor.

21       THE COURT:  Danbury, Connecticut, there we are.  All

22  right.  And his parents can drive him there and report.  And

23  they can visit him there, presumably.

24       And I expect you, Mr. Smith, to hold up your end of

25  this.  And you'll be offered chance to participate in the

71

1    skills program.  Will you accept that offer?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  All right.  I expect you to accept it

4    and you will have an opportunity in the skills program, as I

5    understand it, to develop skill that will help you in the

6    future because you have a lot of life left open to you.  And

7    the whole purpose of this is to help you make the most of the

8    life that you have left opened to you.

9              But you should always carry with you, always carry

10   with you, the certain knowledge that this was very, very

11   serious bad behavior and that it caused very, very serious

12   harm to these young women.  You always need to be aware of

13   that.

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  You're to pay a -- I beg your pardon?

16             THE DEFENDANT:  I regret everything that I did,

17   seriously.

18             THE COURT:  Good.  Well, you'll have to live with

19   that.  You need to live with that.  But that doesn't mean you

20   can't have a full life.  And you need to be very grateful to

21   your parents.  They weren't responsible for the abuse you

22   suffered at that school either.  That's unfortunate.  But you

23   need, since you've been the subject of abuse, you need to be

24   very sensitive never to subject anybody to abuse.  Especially

25   young people.

72

1      You're to pay $100 special assessment.  I don't

2  impose any punitive fine or any fine to cover the cost of

3  incarceration or supervised release.  And the special

4  conditions, I've still got a supervised release, and I'm going

5  to impose a 15-year period of supervised release.  And the

6  purpose of that, Mr. Smith, is to help you adjust to a law

7  abiding life and to help you, continue to help you.  But

8  you'll be subject to the Court's direction.

9      Now as a special condition of the supervised

10  release, you are to participate in and successfully complete

11  any program of mental health testing and counseling.  And you

12  are to -- you are to pay restitution and I have a restitution

13  order here.  You are to pay restitution in the amount of -- a

14  total amount of -- was the total amount $30,000?

15      MS. BRITSCH:  Your Honor, we have an agreed $15,215.

16      THE COURT:  Yes, but I thought that was -- oh, I

17  see.  That's the one -- the H.O. is -- H.O. is ███████████.

18  Right?  I see.  I have two of them and I thought they were

19  separate.  All right.  I have that.

20      MS. BRITSCH:  Your Honor, if we may since it has the

21  victim's name, is it possible to redact that name from the

22  record?

23      THE COURT:  Yes , well --

24      MS. BRITSCH:  From the transcript.

25      THE COURT:  All right.  Let me -- yes.  The answer

73

1    to that is yes.  And let me direct the court reporter to

2    strike that name from the record.  Don't record it.

3           So the restitution order is for a total of $15,215.

4    That's $65 to H.O.; 11,400 to R. and C.E.; 50 to M.M.; M.E. is

5    3,700.  For a total after $15,215.

6           And I'll waive interest and require that it be paid

7    at $100 per month, 60 days after release from confinement, or

8    25 percent of his income, whichever is greater.  And that

9    amount can be increased or decreased as his financial

10   circumstances permit.

11          Now, that amount is not to be paid by his parents.

12   It's to be paid by him.  So if there are -- if he has no

13   income, then he doesn't pay.  But I expect him at some point

14   to be able to get work, get paid, and make these payments.

15   And I'm sure his parents will help him achieve that.  He needs

16   to do that.

17          It isn't easy to find an appropriate employment for

18   persons with any kind of deficit.  But he'll have to try.  If

19   he doesn't, his parents are not to pay the restitution.

20          Now, there's no -- there's no other matter to take

21   care of, is there?

22          Let me ask -- the probation officer is gone.  Oh, we

23   have a probation officer.

24          THE PROBATION:  Yes, but I will certainly defer to

25   Ms. Blanchard's expertise.  I don't have her file.

74

1          THE COURT:  Well, also a special condition of

2     supervised release is that he refrain from any pornography at

3     all, adult and certainly not child pornography.  He can't have

4     any of that.  He can use a computer, but he -- that computer

5     has to be monitored by the probation office with a device that

6     tracks his use of it.

7          And he must register with the state registry for sex

8     offenders.  That cannot be avoided by the law.  And he has to

9     register where he lives, where he works and where he goes to

10    school, if those are three different places.  And he has to

11    maintain that registry current.

12          Now given all of that, have I omitted any?

13          MS. BRITSCH:  Your Honor, we'd ask for a condition

14    that he only be supervised by another adult if he is around

15    children.

16          THE COURT:  Yes, of course.  I'll add that.  I'll

17    add that.  And the adult has to be an informed adult, not just

18    an adult but an adult who knows about this conviction.

19          MS. BRITSCH:  Thank you, Your Honor.

20          THE COURT:  And   --

21          THE PROBATION:  I think you mentioned mental health

22    counseling.

23          THE COURT:  Yes, I did.  He's to participate in

24    mental health counseling at the direction and discretion of

25    the probation officer.  And, of course, you can petition the

75

1    Court for any additional conditions you think are appropriate.

2              All right.  Mr. Smith, you may be seated, sir.

3              Anything further from you, Ms. Britsch?

4              MS. BRITSCH:  Your Honor, we simply have a consent

5    order forfeiture to pass up to the Court.

6              THE COURT:  Yes.  You may hand that to the Court and

7    I will enter that.

8              MS. BRITSCH:  Thank you.

9              THE COURT:  Now, Mr. Zwerling, have I omitted

10   anything from the defendant's point of view?

11             MR. ZWERLING:  No, Your Honor.  We would only ask

12   that if the Court could make a notation for the marshals, so

13   the Bureau of Prisons to try to designate -- make a

14   designation in 30 days.  He's very anxious to start.

15             THE COURT:  Yes, I'll ask for a designation on the

16   judgment and commitment order.  I'll ask them to expedite it

17   since they have all of the material and they've considered it

18   and they've been here to testify.  Let's get it along.

19             Now, Ms. Blanchard is not here, but would you

20   communicate with Ms. Blanchard to tell the Bureau of Prisons

21   he's now been sentenced, get about it, and so his parents can

22   drive him up there.

23             THE PROBATION:  We'll pass that along but we've kind

24   of learned that the Bureau of Prisons marches to their own

25   drum.  We'll certainly pass that along.

76

1          Would Your Honor entertain removing the GPS bracelet

2     on the morning he is to report and his parents take him up

3     there?

4          THE COURT:  Yes, but don't remove it before then.

5     He's subject to all the same conditions until then.

6          THE PROBATION:  The morning of the day that he's to

7     report.

8          THE COURT:  That's correct.

9          THE PROBATION:  Thank you, Your Honor.

10         THE COURT:  Mr. Zwerling.

11         MR. ZWERLING:  That's it, Your Honor.  Thank you.

12         THE COURT:  All right.  And I thank -- I thank the

13    Government and the defense for your patience in this matter.

14    It's taken a long time, but sentencing is not my favorite

15    aspect of this job.  And I do live with these sentences and I

16    need to make sure they're right.  And one of the ways I am

17    certain they're right is because I have the help of competent

18    counsel.

19         And you're quite right, Ms. Britsch, there was no

20    basis for any departure other than the one I mentioned,

21    5K2.16, and none of those applied which isn't to say that I --

22    that I don't think, because I do think, that the Sentencing

23    Commission needs to think about these unique situations.

24         MS. BRITSCH:  Yes, Your Honor.

25         THE COURT:  And especially in an area where medical

77

1   science is in its real infancy.  You know, 20 or 40 years ago,

2   people with autism were effectively discarded by society.  And

3   it's sad but we now have -- we now have a little better handle

4   on it.  And Mr. Smith is fortunate because he's high on the

5   scale.  My nephews are down a little ways farther.  And very

6   difficult to communicate with them if you're not a parent.

7             Mr. and Mrs. Smith, let me take this opportunity to

8   acknowledge your work as Milton's parents.  As a parent I know

9   how difficult these things can be and I congratulate you for

10  all that you've done for your son and will continue to do for

11  your son.

12            MRS. SMITH:  Thank you, Your Honor.

13            THE COURT:  The Court stands -- no, I don't stand in

14  recess.  I've got Ulrich and then I've got Mr. -- what else do

15  I have today?  Oh, I have a plea.

16            Now, let me have the Ulrich counsel at counsel

17  table.

18

19            **(Proceedings adjourned at 5:12 p.m.)**

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Sentencing

7    Hearing in the case of the **UNITED STATES OF AMERICA versus**

8    **MILTON SMITH**, Criminal Action No. 1:15-CR-42, in said court

9    on the 3rd day of February, 2017.

10           I further certify that the foregoing 78 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this January 21, 2019.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                              78